THOMAS, J.,
for the Court:
¶ 1. Terrill Lewis appeals his conviction of delivery of cocaine, raising the following issue as error:
I. THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE THE CRACK COCAINE WHEN A PROPER CHAIN OF CUSTODY HAD NOT BEEN ESTABLISHED.
¶ 2. Finding no error, we affirm.
*849 FACTS
¶ 3. On January 17, 1995, Colleen Patterson, an undercover agent with the Mississippi Bureau of Narcotics, along with Charles Wash, a confidential informant, went to an apartment complex in Clarke County and there purchased $40 worth of crack cocaine from Terrill Lewis and Carl Hicks. Lewis and Hicks were indicted for delivery of a schedule II controlled substance. Hicks pled guilty to the charge, and Lewis pled not guilty. Trial of this matter was commenced on October 27, 1997. After deliberations, the jury returned a verdict of guilty against Lewis. Aggrieved, Lewis perfected this appeal.
ANALYSIS
I.
THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE THE CRACK COCAINE WHEN A PROPER CHAIN OF CUSTODY HAD NOT BEEN ESTABLISHED.
¶ 4. Special Agent Joey Waller testified at trial that at the post-buy meeting Patterson handed the crack cocaine to Shug Cranford, the case agent. Waller testified further that Cranford sealed the drugs in an evidence bag, and that the drugs were then passed to him. Waller testified that he placed the drugs in the evidence vault where they remained until the next day, when he took the drugs and delivered them to the Mississippi Crime Lab in Meridian. The drugs remained there until Waller picked them up and returned them to the evidence vault. Waller testified that according to the evidence submission form of the Mississippi Crime Lab there were two pieces of crack cocaine, although he subsequently testified that only one piece of crack cocaine was purchased, but “[i]t could have been one large rock or two smaller rocks.” Patterson testified that she purchased two rocks of crack cocaine. Patterson testified that she placed the crack cocaine in an evidence bag, initialed it, and handed it to Cranford. Cranford testified that he received the crack cocaine from Patterson, and that he placed the drugs in the evidence bag. Cranford further testified that he took the drugs and handed them over to Waller by placing them in the evidence locker. Cranford testified that there was only one piece of crack cocaine purchased, but that a sliver had broken off.
¶ 5. The crack cocaine, marked as State Exhibit 4, was introduced in the following exchange:
Q. [Mrs. Howell, prosecutor] I am going to ask you to look at what has been marked for identification purposes only as Exhibit 4. Can you tell me what that is?
A. [Grady Downey, forensic scientist with the Mississippi Crime Laboratory] Yes, I can identify it.
[[Image here]]
Q. And what was the result of your testing?
A. That the contents of State’s Exhibit 4 for ID only contains cocaine.
Q. All right. But you don’t know where this cocaine came from; I mean, you have no personal knowledge of that before it came to the laboratory?
A. No, I do not know.
BY MRS. HOWELL: Your Honor, at this time, we would like to have this evidence moved into evidence, Exhibit number 4.
BY THE COURT: Any objection?
BY MR. POTUK [defense counsel]: Yes, Your Honor. There’s not been a proper chain of custody demonstrated for this evidence. I notice that on this bag that has been presented that there are initials “PB” which are on the bag which indicates that this evidence has been in the hand of some other individual. And I am not sure how these drugs got into the hands of the crime lab. I believe it was presented to them by Joey Waller. And unless “PB” is Mr. Downey’s initials *850 that he normally places on the bag when it is received into the crime lab, I mean, I can’t say that, you know, there has been an adequate chain of custody demonstrated for this evidence. Plus, there has been verbal evidence presented to this Court that we had either 1 piece of cocaine or 2 pieces of cocaine that were presented to — .
BY MR. ANGERO [prosecutor]: Judge, if it please the Court, I object to this sort of, this speech. That’s not an objection. That’s not a concise statement of the law.
BY THE COURT: Well, your objection is noted. I thought Mr. Dow-ney, he may not have testified [i]f his initials are on there.
BY MR. ANGERO: Your Honor, the evidence shows that it was delivered from Colleen Patterson to—
BY THE COURT: I am satisfied with the chain of custody.
BY MRS. HOWELL: I will ask him that question, Your Honor.
BY THE COURT: All right.
Q. Are your initials on that bag?
A. They are.
Q. At what point did you put the initials on the bag?
A. When I opened the exhibit to conduct my analysis on the date of my examination is when I placed my initials on there.
BY THE COURT: All right. Your objection is noted. Let what has been previously marked as Exhibit 4 for Identification only now be marked into evidence as Exhibit 4.
(THE ABOVE-MENTIONED EXHIBIT 4 FOR IDENTIFICATION ONLY WAS RECEIVED INTO EVIDENCE AND MARKED AS EXHIBIT 4.)
Q. Downey, Mr. Potuk mentioned a “PB” initials being on the bag. Who would “PB” be?
A. That would be Pat Barnes. Pat Barnes at this time was a forensic scientist working with the Mississippi Crime Lab. She is the one who actually received the evidence into the crime lab from Joey Waller. And Pat has since gone to work with the Jackson Police Department Crime Lab.
Q. Okay. And is that the procedure for the crime lab, that anyone that touches this evidence has to initial?
A. Yes. When evidence is received into the crime lab, the person receiving the evidence will place the crime lab number on the evidence, also the date and time that they receive it. And that information is also placed on the laboratory submission sheet. When the person bringing the evidence into the lab delivers the evidence, he will place his name, title, date and time on the laboratory submission sheet, and the person receiving the evidence will also do the same.
BY MRS. HOWELL: I tender the witness, Your Honor.
BY THE COURT: All right. Cross-examination.

CROSS EXAMINATION BY MR. PO-TUK:

Q. Mr. Downey, when the evidence is submitted to the crime lab, what is used to receive the evidence into the crime lab?
A. I am not sure that I understand.
Q. Is there a document that y’all sign that the agent who brings the drugs up to the crime lab signs and is there a document that somebody in the crime lab signs to document the evidence that is presented to y’all.
A. Yes. As I previously stated, that is the laboratory submission sheet.
Q. Okay. And do you have a copy of that that was submitted to you on the evidence that was given to you in this case?
A. Yes, I do.
Q. May I see it, please?
*851 (DOCUMENT TENDERED TO MR. POTUK.)
Q. It’s my understanding that you did not receive this evidence from Mr. Waller when he brought it up to the crime lab.
A. No, I did not.
Q. Would you tell me what exhibit 1 is on this evidence submission form?
A. Yes. It is described as 1 evidence bag sealed with evidence tape containing approximately 2 pieces of alleged cocaine.
Q. And what is it that is initialed in or written in on this document?
A. This is when the evidence was actually received into the lab. The person receiving it, Pat Barnes, made a notation that it was, my copy is not very plain. Looks like it’s plus 1 more piece, as if the rock had been broken during transport to the lab.
Q. I’m sorry. Does that say plus 1 piece or does that say 1 piece and it has Pat Barnes’ initials, “PB”?
A. My copy is not that plain. It looks to me as if it says plus 1 piece.
Q. But you are really not sure what that means, do you?
A. No, I am not positive as to the exact meaning of that. But, normally, when evidence is received, it often is broken during transportation, especially these rocks. And we will make notes that the evidence has been crushed or crumbled and has been fragmented to mean more pieces than what is actually described.
Q. Okay. But you really don’t know what that means?
A. No, I am not absolutely sure.
BY MR. POTUK: No further questions, Your Honor.
BY THE COURT: All right. Any redirect?
BY MRS. HOWELL: Yes, Your Honor.

REDIRECT EXAMINATION BY MRS. HOWELL:

Q. I am going to ask the witness if this is a plainer copy. Can you tell any more?
A. No. It still looks like it says plus 1 piece.
Q. Let me ask you this. Patricia Barnes, is she a forensic scientist, as well?
A. Yes, she is.
Q. Do you rotate and take turns as to who receives evidence in your lab?
A. We have an evidence technician, and that’s her primary obligation, is to receive the evidence. When evidence is delivered to the lab, it is her responsibility to receive that evidence. But due to circumstances, such as vacation or sickness, she may not be in the lab or she may also be unavailable at that time. She may be tied up with some other responsibility. And anyone at the crime lab who is a forensic scientist, also has the obligation to receive evidence.
Q. Okay. Do you do that on occasion.
A. Yes, I do.
Q. Okay. And would this be something that is normal to write in above what has been typed on a form?
A. Yes. If there is any discrepancy in the description of the evidence as it comes into the lab as what is typed in and what we actually witness, we will make notations as to the condition of the sample.
Q. And the submission form is typed up before it’s brought into the lab; is that correct?
A. That’s correct.
Q. Okay. So the only way that you would have to alter it would be to write in?
A. That is correct.
BY MR. ANGERO: Your Honor, at this time we would like to move this *852 submission form into evidence. I will show you. It’s just another copy.
[[Image here]]
(DOCUMENT TENDERED TO THE COURT.)
BY THE COURT: Let that be marked into evidence as Exhibit 6.
(THE ABOVE-MENTIONED DOCUMENT WAS RECEIVED INTO EVIDENCE AND MARKED AS EXHIBIT 6.)
¶ 6. Lewis argues that the trial record as related above is replete with a confusing array of “evidence” as to how many rocks of crack cocaine were actually purchased, who actually handled the crack cocaine before it was placed in an evidence bag, and who actually carried the drugs to the evidence vault at the narcotics bureau. Lewis further argues that there was also a lack of information presented to the court as to what happened to these drugs once they were carried to the Mississippi Crime Lab. Therefore, Lewis argues there was insufficient evidence to show that the drugs submitted to the Mississippi Crime Laboratory were in fact the drugs that were purchased, and there was insufficient evidence of the proper chain of custody once these drugs were received, forwarded to the lab, analyzed, and returned. Consequently, Lewis maintains that there was insufficient evidence for the court to ascertain whether there was any indication of tampering or substitution of evidence, thereby requiring us to remand to the lower court for retrial. We disagree.
¶ 7. The pertinent question regarding chain of custody is “whether there is any indication of tampering or substitution of evidence.” Wells v. State, 604 So.2d 271, 277 (Miss.1992). Furthermore, our supreme court has often stated that issues involving the chain of custody of evidence are left to the sound discretion of the trial court, Doby v. State, 632 So.2d 684, 588 (Miss.1988), and that we “will not reverse the trial court’s ruling except where this discretion has been ‘so abused as to be prejudicial to the defendant.’ ” Lambert v. State, 462 So.2d 308, 312 (Miss.1984). The record in the case at bar reveals no abuse of discretion.
¶ 8. Wall testified that “what is in this bag was what Agent Patterson actually purchased for $40.” Patterson testified that State’s Exhibit 4 was the crack cocaine she purchased from Lewis. Cran-ford identified State’s Exhibit 4 as the crack cocaine purchased from Lewis that Patterson turned over to him. Whether Patterson placed the crack cocaine in the evidence bag and gave it to Cranford, or Patterson gave the crack cocaine to Cran-ford who then placed it in the evidence bag, is of no moment, as long as the officers testify, as they did, that the crack cocaine purchased is the crack cocaine that is in State’s Exhibit 4. Similarly, it matters not whether Cranford gave the evidence bag to Waller, who placed it in the evidence vault, or if Cranford placed the evidence bag in the evidence vault in Waller’s presence, since both officers testified that the crack cocaine purchased is the crack cocaine in State’s Exhibit 4. Finally, it matters not that the person who received the evidence into the crime lab did not testify. A technical break in the chain of custody does not automatically result in reversal. Our supreme court has recognized that the testimony of everyone in the chain of custody is not required. Our supreme court has stated as follows:
We have never required the proponent to produce every person who handled the object, nor to account for every moment of every day. See Doby v. State, 532 So.2d 584, 588 (Miss.1988). Pre-Rules and post-Rules, the proponent must satisfy the trial court that there is no reasonable inference of material tampering with or (deliberate or accidental) substitution of the evidence. See Wilson v. State, 574 So.2d 1324, 1335 (Miss. 1990); Hemphill v. State, 566 So.2d 207, 208-09 (Miss.1990); Minnick v. State, 551 So.2d 77, 89-90 (Miss.1988), rev’d on other grounds 498 U.S. 146, 111 S.Ct. *853 486, 112 L.Ed.2d 489 (1990); Doby v. State, 532 So.2d 584, 588 (Miss.1988); Gibson v. State, 503 So.2d 230, 234 (Miss.1987).
Butler v. State, 592 So.2d 983, 985 (Miss. 1991).
¶ 9. Finally, the testimony of Waller, Cranford, and Downey attested to the fragile nature of crack cocaine. Any “confusion” over the number of pieces purchased was dealt with and explained at trial. In the end there was simply no indication or reasonable inference of probable tampering or substitution of the evidence. This assignment is without merit.
¶ 10. THE JUDGMENT OF THE CIRCUIT COURT OF CLARKE COUNTY OF CONVICTION OF DELIVERY OF COCAINE AND SENTENCE OF TWELVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND FINE OF $1,000 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO CLARKE COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, DIAZ, IRVING, LEE, MOORE, AND PAYNE, JJ., CONCUR.